[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action is a real estate tax appeal for property located at Two Shaws Cove, New London covering the grand lists of October 1, 1999, the last revaluation year, and the grand lists of October 1, 2000 through October 1, 2002. The plaintiff had appealed to the Board of Assessment Appeals (Board) for the City of New London claiming that the assessor for the City had overvalued its property. The Board reduced the valuation of the subject property from $2,960,100 set by the assessor to $2,400,800.
The subject property, Two Shaws Cove, is a two-story commercial office building located in a six-building office park known as "Two Shaws Cove Office Park." The office park is located in a general commercial business district zone in the city of New London just west of the Thames River.
The office park was developed in the 1980s. The area consists of commercial and residential uses along Bank Street, with marinas and retail operations opposite the subject property on Howard Street. As of the valuation date, the area south of the subject property has been going through a period of revitalization. This revitalization includes the construction of the Pfizer Global Research Center, and the development of the Fort Trumbull area just south of the subject. In addition, new access roads and other improvements are being completed. The revitalization of the area, at the time of the revaluation, has resulted in an increased enthusiasm and interest in the area.
The subject property consists of 2.58 acres of land with frontage on Hamilton Street and Shaw Street. The building at Two Shaws Cove is a two-story office building constructed in 1988 containing a gross square foot building area of 31,366 and a net rentable space of 27,543 square feet. The building contains space for seven separate offices. The subject property contains a paved parking area of 13,500 square feet. After the plaintiff purchased the property, the sum of $500,000 was spent for improvements to the building. CT Page 2578-ad
Plaintiff's appraiser, Thomas Merola (Merola), and defendant's appraiser, Robert J. Flanagan (Flanagan), are of the opinion that the highest and best use of the subject property is its continued use as an income producing office building. We agree. Both appraisers used the sales comparison approach and the income approach to determine value.
We have analyzed the comparable sales selected by both appraisers and conclude that, for the most part, these sales are not representative of truly comparable sales when compared to the subject property. For the most part, the comparable sales selected by both appraisers did not fit the mold of the plaintiff's property which was a class A office building built within the confines of an upscale office park located in a very desirable part of the City.
We find that the income approach is the only credible method to use to arrive at the fair market value of the subject property.
Merola arrived at a final conclusion of fair market value of $1,867,500 taking 50% of $2,010,000 using the income approach and by taking 50% of $1,725,000 using the sales approach.
Flanagan, using the sales comparison approach, found the fair market value of the subject to be $2,410,000. However, Flanagan placed most of his reliance on the income approach and concluded that the fair market value of the subject was $2,450,000.
In considering the income approach to determine value, we have reviewed and analyzed the lease abstracts and testimony presented by both appraisers. We conclude that the market rent for the subject property on October 1, 1999 was $16.50 per square foot net for commercial office rent. Both Merola and Flanagan considered the contract rents of office space leased at the subject Two Shaws Cove. The contract rents ran from $13.50 per square foot of rentable space to $17.23 of rentable space. In 1999, there was a general trend in the renewed leases for rents to increase in the market. We also reviewed market rents shown in lease abstracts presented by Flanagan covering rentals of other buildings in Two Shaws Cove Office Park as well as other nearby office rental property. The rentals of other office buildings in the market in 1999, according to Flanagan, ranged from $13.20 to $19.20 per square foot of leasable space. Merola developed his market rent by obtaining information as to rentals of office space offered in New London from commercial rental agents in the area rather than using actual rents in the market. "Market rent is the rental income that a property would most probably command in the open market; it is indicated by the current rents paid and asked for comparable space as of the date of the appraisal." The CT Page 2578-ae Appraisal of Real Estate (10th Ed. 1992) p. 435. The rental agents reported to Merola that office space was available in the subject market area from $8.50 to $19.20 per square foot in various square foot areas for lease. Based on our consideration of the contract rent for the subject property, and the market rent, we conclude that $16.50 per square foot net is the most credible market rent as of October 1, 1999. The net rentable area of the subject was found by Merola to be 27,298 square feet. Flanagan found the net rentable area to be 27,543 square feet. We consider it more credible to use Flanagan's 27,543 square feet of net rentable space in the subject. We find the gross income of the subject to be $454,460 (27,543 square feet multiplied by $16.50 per square foot).
We next consider the operating expense for the subject property as it relates to our finding of value. Merola used the actual operating expenses of the subject property for the years 1998 and 1999. Merola had examined expenses of other property in the market and considered the actual expenses of the subject to approximate market expenses. For 1998, Merola found the operating expenses to be $136,162. Merola found the 1999 operating expenses to be $168,219. There was a significant difference in the professional fees reported by Merola in the 1999 expenses as compared to the 1998 expenses. The difference was due to the inclusion, in the 1999 figures, of attorney fees incurred by the plaintiff for representation before the Board, and for accounting fees related to reports to investors in the plaintiff's business. Plaintiff also paid attorney fees for preparation of the leases used in the subject property.
"Operating expenses are the periodic expenditures necessary to maintainthe real property and continue the production of the effective grossincome." The Appraisal of Real Estate (10th Ed. 1992) p. 444. Using this definition of operating expenses, we find that attorney fees incurred by the plaintiff for representation before the Board, and accounting fees related to reports to investors should not be included as operating expenses.
Normally, management fees, as part of operating expenses, are usually expressed in terms of a percentage of effective gross income, "and reflect the local pattern for such charges." The Appraisal of Real Estate (10th Ed. 1992) p. 446. Management expenses include supervision, accounting, telephone service, clerical help, legal, printing, postage and advertising. Id.
Flanagan arrived at his estimate of operating expenses after considering the past operating expenses of the subject property similar to properties to the subject. Flanagan concluded that total operating CT Page 2578-af expenses amounted to $132,351. Flanagan used, for the most part, the actual operating expenses of the subject for 1998, not 1999. Flanagan also estimated professional fees at $24,400, and management fees at 5% of effective gross income. We have arrived at an operating expense of $146,446 by deducting professional fees and contingencies unrelated to maintenance of the property and the production of gross income from Merola's finding of market operating expenses in 1999.
Considering the opinions and findings of both appraisers and the plaintiff's vacancy and collection experience over the past five years, as reported by its managing partner, we conclude that the vacancy and collection factor should be 10%, and the management fees should be 7% of gross income. Both Merola and Flanagan arrived at the same capitalization rate of 11.5% that included an effective tax rate of 2.345% which we find credible. Our final analysis, after considering the opinions and findings of both appraisers, and to the credibility we have given to their findings, we conclude that fair market value of the subject property, as of October 1, 1999 was as follows:
Gross Income $454,460
Vacancy Collection (10%) 45,446
Effective Gross Income $409,014
Operating Expense 146,446
Net Operating Income $262,568
Direct Capitalization Rate 11.5%
$262,568/115 $2,283,200
Since our determination of fair market value of the subject property as of October 1, 1999 at $2,283,200 is less than the $2,400,800 valuation placed on the subject property by the Board, we find the plaintiff to be an aggrieved party. See Ireland v. Wethersfield, 242 Conn. 550, 558,698 A.2d 888 (1997). CT Page 2578-ag
Accordingly, judgment may enter in favor of the plaintiff with the fair market value of the subject property, set as of October 1, 1999, at $2,283,200 without costs to either party.
 Arnold W. Aronson Judge Trial Referee
CT Page 2578-ah